# In the United States Court of Federal Claims
**OFFICE OF SPECIAL MASTERS**
No. 21-0283V

| | |
|---|---|
| XIN JIN,<br><br>      Petitioner,<br>v.<br><br>SECRETARY OF HEALTH AND<br>HUMAN SERVICES,<br><br>      Respondent. | Chief Special Master Corcoran<br><br>Filed: February 19, 2025 |

*Leah VaSahnja Durant, Law Offices of Leah V. Durant, PLLC, Washington, DC, for Petitioner.*

*Lynn Christina Schlie, U.S. Department of Justice, Washington, DC, for Respondent.*

**RULING ON ENTITLEMENT**[1]

On January 7, 2021, Xin Jin filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"), which she amended on July 1, 2022. Petitioner alleges that she suffered a left shoulder injury related to vaccine administration ("SIRVA") resulting from an influenza ("flu") vaccine received on January 18, 2020. Amended Petition at 1. The case was assigned to the Special Processing Unit of the Office of Special Masters.

---

[1] Because this Ruling contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the Ruling will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2018).

Respondent agreed that Petitioner's injury was consistent with a SIRVA, but opposed compensation on the ground that Petitioner had not shown that she suffered the residual effects of her injury for more than six months (ECF No. 34). The parties then briefed entitlement (ECF Nos. 39, 41, 42). For the reasons discussed below, I find that record evidence preponderantly establishes that Petitioner's symptoms continued for more than six months, thus satisfying the statutory severity requirement, and that Petitioner has satisfied the remaining requirements for entitlement.

## I. Factual Findings and Ruling on Entitlement

### A. Legal Standards

Before compensation can be awarded under the Vaccine Act, a petitioner must preponderantly demonstrate all matters required under Section 11(c)(1), including the factual circumstances surrounding his or her claim. Section 13(a)(1)(A). In making this determination, the special master or court should consider the record as a whole. Section 13(a)(1). Petitioner's allegations must be supported by medical records or by medical opinion. *Id.*

To resolve factual issues, the special master must weigh the evidence presented, which may include contemporaneous medical records and testimony. *See Burns v. Sec'y of Health & Human Servs.,* 3 F.3d 415, 417 (Fed. Cir. 1993) (explaining that a special master must decide what weight to give evidence including oral testimony and contemporaneous medical records). "Medical records, in general, warrant consideration as trustworthy evidence. The records contain information supplied to or by health professionals to facilitate diagnosis and treatment of medical conditions. With proper treatment hanging in the balance, accuracy has an extra premium. These records are also generally contemporaneous to the medical events." *Cucuras v. Sec'y of Health & Human Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993).

To overcome the presumptive accuracy of medical records testimony, a petitioner may present testimony which is "consistent, clear, cogent, and compelling." *Sanchez v. Sec'y of Health & Human Servs.,* No. 11-685V, 2013 WL 1880825, at *3 (Fed. Cl. Spec. Mstr. Apr. 10, 2013) (citing *Blutstein v. Sec'y of Health & Human Servs.,* No. 90-2808V, 1998 WL 408611, at *5 (Fed. Cl. Spec. Mstr. June 30, 1998)). The Federal Circuit has "reject[ed] as incorrect the presumption that medical records are accurate and complete as to all the patient's physical conditions." *Kirby v. Sec'y of Health & Human Servs.*, 997 F.3d 1378, 1383 (Fed. Cir. 2021) (explaining that a patient may not report every ailment, or a physician may enter information incorrectly or not record everything he or she observes).

2

In addition to requirements concerning the vaccination received and the lack of other award or settlement,³ a petitioner must establish that he or she suffered an injury meeting the Table criteria, in which case causation is presumed, or an injury shown to be caused-in-fact by the vaccination he or she received. Section 11(c)(1)(C). The Vaccine Act further includes a "severity requirement," pursuant to which a petitioner demonstrate that they:

> (i) suffered the residual effects or complications of such illness, disability, injury, or condition for more than 6 months after the administration of the vaccine, or (ii) died from the administration of the vaccine, or (iii) suffered such illness, disability, injury or condition from the vaccine which resulted in inpatient hospitalization and surgical intervention.

Section 11(c)(1)(D).

"[T]he fact that a petitioner has been discharged from medical care does not necessarily indicate that there are no remaining or residual effects from her alleged injury." *Morine v. Sec'y of Health & Human Servs.*, No. 17-1013, 2019 WL 978825, at *4 (Fed. Cl. Spec. Mstr. Jan. 23, 2019); *see also Herren v. Sec'y of Health & Human Servs.*, No. 13-1000V, 2014 WL 3889070, at *3 (Fed. Cl. Spec. Mstr. July 18, 2014) ("a discharge from medical care does not necessarily indicate there are no residual effects"). "A treatment gap . . . does not automatically mean severity cannot be established." *Law v. Sec'y of Health & Human Servs.*, No. 21-0699V, 2023 WL 2641502, at *5 (Fed. Cl. Spec. Mstr. Feb. 23, 2023) (finding severity requirement met where petitioner sought care for under three months and had met physical therapy goals but still lacked full range of motion and experienced difficulty with certain activities, then returned to care nearly five months later reporting stiffness and continuing restrictions in motion); *see also Peeples v. Sec'y of Health & Human Servs.*, No. 20-0634V, 2022 WL 2387749 (Fed. Cl. Spec. Mstr. May 26, 2022) (finding severity requirement met where the petitioner sought care for four months, followed by fifteen month gap); *Silvestri v. Sec'y of Health & Human Servs.*, No. 19-1045V, 2021 WL 4205313 (Fed. Cl. Spec. Mstr. Aug. 16, 2021) (finding severity requirement satisfied where petitioner did not seek additional treatment after the five month mark.

The most recent version of the Table, which can be found at 42 C.F.R. § 100.3, identifies the vaccines covered under the Program, the corresponding injuries, and the time period in which the particular injuries must occur after vaccination. Section 14(a). Pursuant to the Vaccine Injury Table, a SIRVA is compensable if it manifests within 48 hours of the administration of a flu vaccine. 42 C.F. R. § 100.3(a)(XIV)(B). The criteria

---

³ In summary, a petitioner must establish that he received a vaccine covered by the Program, administered either in the United States and its territories or in another geographical area but qualifying for a limited exception and has not filed a civil suit or collected an award or settlement for his or her injury. Section 11(c)(1)(A)(B)(E).

3

establishing a SIRVA under the accompanying Qualifications and Aids to Interpretation ("QAI") are as follows:

> Shoulder injury related to vaccine administration (SIRVA). SIRVA manifests as shoulder pain and limited range of motion occurring after the administration of a vaccine intended for intramuscular administration in the upper arm. These symptoms are thought to occur as a result of unintended injection of vaccine antigen or trauma from the needle into and around the underlying bursa of the shoulder resulting in an inflammatory reaction. SIRVA is caused by an injury to the musculoskeletal structures of the shoulder (e.g. tendons, ligaments, bursae, etc.). SIRVA is not a neurological injury and abnormalities on neurological examination or nerve conduction studies (NCS) and/or electromyographic (EMG) studies would not support SIRVA as a diagnosis (even if the condition causing the neurological abnormality is not known). A vaccine recipient shall be considered to have suffered SIRVA if such recipient manifests all of the following:
>
> (i) No history of pain, inflammation or dysfunction of the affected shoulder prior to intramuscular vaccine administration that would explain the alleged signs, symptoms, examination findings, and/or diagnostic studies occurring after vaccine injection;
>
> (ii) Pain occurs within the specified time-frame;
>
> (iii) Pain and reduced range of motion are limited to the shoulder in which the intramuscular vaccine was administered; and
>
> (iv) No other condition or abnormality is present that would explain the patient's symptoms (*e.g.* NCS/EMG or clinical evidence of radiculopathy, brachial neuritis, mononeuropathies, or any other neuropathy).

42 C.F.R. § 100.3(c)(10).

A special master may find that the first symptom or manifestation of onset of an injury occurred "within the time period described in the Vaccine Injury Table even though the occurrence of such symptom or manifestation was not recorded or was incorrectly recorded as having occurred outside such period." Section 13(b)(2). "Such a finding may be made only upon demonstration by a preponderance of the evidence that the onset [of the injury] . . . did in fact occur within the time period described in the Vaccine Injury Table." *Id.*

### B. Relevant Factual History

This ruling contains only a brief overview of facts most relevant to the parties' dispute.

### 1. Medical Records

On January 18, 2020, Petitioner received a flu vaccine in her left deltoid. Ex. 1 at 2. Four days later, she was seen by physician assistant ("PA") Diane Sturgill for left shoulder pain that she reported began after her vaccination, which she explained was given too high in her shoulder rather than in the deltoid muscle. Ex. 4 at 4, 13. On examination, Petitioner's range of motion ("ROM") was normal. *Id.* at 14. She was assessed with left shoulder acute pain and tendonitis, and given oral steroid medication. *Id.*

About two weeks later (February 3, 2020), Petitioner was seen by orthopedist Dr. Paul McLendon. Ex. 10 at 3. She complained of left shoulder pain after vaccination and explained that the steroid medication had helped, but after the medication wore off the pain returned and was now worsening (at a six out of ten level). *Id.* at 3, 5. On examination, her left shoulder ROM showed mild limitations and x-rays were normal.[4] *Id.* at 5. Dr. McLendon's impression was that Petitioner had SIRVA, with "subacromial bursitis vs. [r]otator cuff tendinitis [two] weeks after receiving a flu shot in the area of her rotator cuff." *Id.* at 6. He recommended conservative treatment including activity modification, physical therapy ("PT"), oral pain medication, and potentially cortisone injections. *Id.*

On February 24, 2020, Petitioner called Dr. McLendon's office requesting to come in again sooner than her then-scheduled appointment of May 5th. Ex. 9 at 30. Her appointment was rescheduled to March 17th. *Id.* The record shows that Petitioner canceled the March 17th appointment two days beforehand, on March 15th. *Id.* at 29. The reason for cancellation is noted as "Patient Personal Reason." *Id.*

There are no treatment records for Petitioner's left shoulder for approximately the next seven months, with Petitioner returning to Dr. McLendon on September 11, 2020, to follow up on her left shoulder pain symptoms. Ex. 5 at 44. She complained of reduced ROM, stiffness, and heaviness in her left shoulder, and rated her pain as five out of ten. *Id.* at 45. She explained that she "did better for a while after her last visit, but the pain has since returned." *Id.* Dr. McLendon's impression was left proximal biceps tendinitis. *Id.* at 47. He recommended that she start PT and return in three months. *Id.*

Five days later (September 16, 2020), Petitioner underwent a PT evaluation via telemedicine for pain "following getting the flu shot 01/2020." Ex. 2 at 65. She had taken anti-inflammatory medications as recommended, but had to stop due to gastrointestinal

---

[4] Petitioner's left shoulder active ROM was 170 degrees in forward flexion, 160 degrees in abduction, and 80 degrees in external rotation. Ex. 10 at 5. Normal shoulder ROM for adults ranges from 165 to 180 degrees in flexion, 170 to 180 degrees in abduction, and 90 to 100 degrees in external rotation. Cynthia C. Norkin and D. Joyce White, MEASUREMENT OF JOINT MOTION: A GUIDE TO GONIOMETRY 72, 80, 88 (F. A. Davis Co., 5th ed. 2016).

distress. *Id.* She had seen mild improvements recently, but continued to have diffuse shoulder pain, as well as pain with rotation and overhead movements. *Id.* at 66. She had difficulty sleeping on her left side, doing dishes, pushing up from a chair, reaching overhead or behind her back, opening jars and doors, and lifting weighted objects. *Id.* She rated her pain as two at best and six at worst. *Id.* On examination, she displayed painful ROM. *Id.* The treatment record notes that her treatment was virtual due to the COVID-19 Pandemic. *Id.* at 67. Petitioner continued PT through February 2021. *Id.* at 5-62; Ex. 7 at 1-38; Ex. 14 at 4. She also followed up with Dr. McLendon during this time and underwent an MRI. Ex. 5 at 23-35; Ex. 6 at 1-2.

### 2. Declarations

Petitioner submitted four declarations in support of her claim.[5] Exs. 11, 18, 19, 20. Petitioner states that her shoulder pain began a few hours after vaccination, and kept her "awake all night." Ex. 11 at ¶ 2. The following day she cancelled her planned activities and stayed home to rest. *Id.* By four days after vaccination, she "couldn't bear the pain anymore" and went to urgent care after work. *Id.* at ¶ 3. The steroid medication she received helped, but the pain returned as soon as she finished the medication. *Id.*

After Petitioner saw Dr. McLendon in early February 2020, she started taking ibuprofen and doing exercises, but this did not provide much relief. Ex. 18 at ¶ 2. She wanted to return to Dr. McLendon sooner than scheduled, so she called in late February to move up her appointment. *Id.* Ibuprofen upset her stomach, so she switched to Aleve, but unfortunately the side effects of that medication were "just as bad." *Id.* at ¶ 3.

Petitioner explains that while this was going on, and she was suffering from shoulder pain, sleep disruption, and side effects of pain medications, "our world had been turned upside down because of COVID-19." Ex. 18 at ¶ 4. She stopped taking ibuprofen because it upset her stomach. *Id.* With "unprecedented restrictions, bans, and closings," and living with her elderly mother, she was extremely nervous about contracting the COVID-19 virus. *Id.* For that reason, she decided to cancel her follow up with Dr. McLendon that was scheduled for March 17, 2020. *Id.*

Petitioner has been "doing everything I can to protect my vulnerable mom from contracting the [COVID-19] virus." Ex. 18 at ¶ 5. She has continued to wear a mask, and stopped dining in restaurants. *Id.* She went out only for work and grocery shopping, and did not allow any visitors to their home until after her mom received her second dose of the COVID vaccine in March of 2021. *Id.* She cancelled her routine dental appointment, physical exam, and mammogram, and missed early detection of breast cancer – which

---

[5] Although Petitioner labeled these exhibits as affidavits, they are not notarized. Nonetheless, they are acceptable as declarations. 28 U.S.C. § 1746.

was found in the beginning of 2021 – and thus required more aggressive chemotherapy. *Id.*

Petitioner tried to live with the shoulder pain, but it was "very distracting." Ex. 18 at ¶ 6. She states that "[p]robably around June of 2020" she started having an odd feeling inside of her left shoulder joint when washing dishes, as if her shoulder joint was locked or stuck. *Id.* Later, this "stuck and stiff" feeling became stronger and more noticeable, even without activity, and her shoulder pain got worse. *Id.* Her sleep also worsened. *Id.* Advil and Aleve did not reduce the pain. *Id.* She used ice and a TENS[6] unit "almost every evening." *Id.* She paused work to do shoulder exercises a few times a day, and tried cupping therapy at home – but nothing helped. *Id.* She became frustrated and moody, and isolated herself. *Id.* She now thinks she should have called Dr. McLendon's office, but she was still afraid to go to the hospital due to COVID-19. *Id.*

By the end of August 2020, Petitioner was "unable to bear" the shoulder pain, sleep disruption, loss of ROM, and other ailments and decided that she needed help. Ex. 18 at ¶ 8. She called Dr. McLendon's office on August 31, 2020 and requested a virtual appointment. *Id.* However, she was told that the appointment needed to be in person so that the doctor could examine her shoulder. *Id.*

Petitioner attended the September 2020 appointment with Dr. McLendon in an N95 mask with a cloth mask over it and protective glasses. Ex. 18 at ¶ 9. She took the stairs instead of the elevator. *Id.* She then did virtual PT. *Id.* at ¶ 10. However, she had to stop PT due to a cancer diagnosis in February 2021. *Id.*

Daniel Broza, a close friend of Petitioner, submitted a declaration on her behalf. Ex. 19. He explained that he speaks with Petitioner by phone every night and visits her at least once a week. *Id.* at ¶ 1. He and Petitioner had dinner the night of her vaccination and she said the vaccine had been given too high on her shoulder and she was in pain. *Id.* Over the next few days, the pain became worse. *Id.* Mr. Broza and Petitioner went to the CVS where the vaccine was administered about a week afterward and spoke to the manager and pharmacist on duty, who said they would re-train the pharmacist who administered the vaccine. *Id.*

Mr. Broza explains that when the COVID-19 Pandemic began, Petitioner was cautious to protect her mother. Ex. 19 at ¶ 2. Petitioner avoided restaurants and public transportation, and wore a mask to work and the grocery store. *Id.* She did not allow Mr. Broza, or anyone else, to enter her home for over a year – until two weeks after he, Petitioner, and her mother had all received their second dose of the COVID vaccine. *Id.*

---

[6] TENS is an abbreviation for transcutaneous electrical nerve stimulation, which involves electrical stimulation of nerves that interferes with transmission of pain signals. *TENS* and *transcutaneous electrical nerve stimulation*, DORLAND'S ONLINE, https://www.dorlandsonline.com/dorland/definition?id=108464 (last visited Feb. 19, 2025).

During the Pandemic, Mr. Broza and Petitioner talked about two things every night: the latest news on the Pandemic, and her shoulder pain and how it affected her sleep, mood, work, and quality of life. Ex. 19 at ¶ 3. He adds that Petitioner has a high pain tolerance, never complaining about pain from a double mastectomy, complete hysterectomy, or side effects from multiple rounds of chemotherapy – but was "very bothered" by her shoulder pain and complained about it nightly. *Id.* at ¶ 4.

### C. The Parties' Arguments

Petitioner contends that the record demonstrates that she suffered the residual effects or complications of SIRVA for more than six months. Petitioner's Motion for a Ruling on the Record, filed Nov. 17, 2023, at *11 (ECF No. 39) ("Mot."). She asserts that there are numerous records beyond the six-month mark establishing the continued existence of shoulder pain, including her September 2020 orthopedic appointment and numerous PT sessions. *Id.*

The seven-month gap in treatment, Petitioner argues, was due to the COVID-19 Pandemic and her efforts to protect her elderly mother from exposure to the COVID virus. Mot. at *12. Petitioner cancelled her March 17, 2020 appointment for this reason. *Id.* When she sought another appointment in August 2020, she requested a video appointment – but was told that an in-person office visit was required. *Id.* at *13. Petitioner argues that the lack of any intervening injury, combined with the medical records and declarations that are consistent with each other and corroborate the medical records, demonstrate that the statutory severity requirement is met. *Id.* at *13-14.

Respondent maintains that the record does not preponderantly establish six months of injury sequelae.[7] Respondent's brief, filed Jan. 10, 2024, at *1, 5 (ECF No. 41) ("Resp."). The record establishes the treatment gap, and then, when Petitioner returned to her orthopedist in September 2020, she reported that her shoulder pain "did better for a while after her last visit, but the pain has since returned." *Id.* Respondent emphasizes that the seven-month treatment gap is "even more stark" in this case because the gap began only 16 days after vaccination. *Id.* Respondent finds further cause for concern in the fact that Petitioner had reported shoulder issues several years before vaccination – although the record he cites (a May 2, 2017 record noting diagnosis of "Shoulder pain, unspecified chronicity, unspecified laterality," Ex. 8 at 76) does not specify *which* shoulder was affected or provide any details about it. *Id.*

Respondent further argues that the severity requirement cannot be satisfied solely with testimonial evidence, but requires consideration of the record as a whole, citing *Colon v. Sec'y of Health & Human Servs.*, 156 Fed. Cl. 534, 540-41 (2021). Resp. at *5.

---

[7] Respondent does not contest entitlement on any other grounds. Resp. at *5.

8

Respondent adds that Petitioner did not report any ongoing shoulder problems to her health care providers via phone, or request telehealth appointments. *Id.* at *6.

On reply, Petitioner maintains that her shoulder pain did not resolve and then return – but also that even if this were so, it would not be inconsistent with what is often seen with a SIRVA. Petitioner's Reply, filed Feb. 9, 2024, at *3 (ECF No. 42) ("Reply"). Rather, waxing and waning of symptoms is a "common fact pattern in the Vaccine Program." Reply at *3. And Petitioner argues that the Federal Circuit has "stressed the importance of affidavits as both reliable and 'objective' evidence," citing *James-Cornelius v. Sec'y of Health & Human Servs.*, 984 F.3d 1374 (Fed. Cir. 2021). *Id.*

Petitioner argues that she has presented "a completely reasonable explanation for the gap in treatment, the COVID-19 Pandemic, and her fear that her elderly mother would contract the virus." Reply at *4. Petitioner asserts that Respondent "forgets the early days of the pandemic, when people around the world feared for their lives and obtaining medical treatment for a non-life-threatening condition was extremely difficult, if not impossible." *Id.* at *5.

### D.  Factual Finding Regarding QAI Criteria for Table SIRVA

Respondent does not contest the four primary SIRVA QAI criteria, and I find that they are satisfied. There is no evidence that Petitioner had a pre-vaccination left shoulder condition, or another condition or abnormality, that would explain her symptoms after vaccination. Ex. 8.[8] The record preponderantly supports a finding that the onset of her shoulder pain most likely occurred within 48 hours of vaccination. Ex. 4 at 13; Ex. 10 at 3. She exhibited reduced ROM, and her symptoms were limited to her left shoulder (where she received the flu vaccine). *Id.* at 3, 5.

### E.  Statutory Severity Requirement

After a thorough review of the record, I find that Petitioner has demonstrated that she suffered the residual effects of her injury for more than six months. In many cases, a fact pattern like this one – where early treatment is followed by a lengthy cessation of medical assistance – would be deemed insufficient to establish severity. But the unique timing of Petitioner's injury and initial care, coupled with her demonstrated precautions to protect her elderly mother during the onset of the Pandemic, result in a different outcome.

---

[8] Respondent cites a single May 2, 2017 record of shoulder pain of unspecified laterality (Ex. 8 at 76) nearly three years prior to vaccination – not to cast doubt on Petitioner's SIRVA claim, but to suggest that her care in September 2020 and later could have been due to a prior injury and not her SIRVA. This record does not specify which shoulder was painful or provide any further details. Moreover, the record indicates that it was a lab visit, and that Petitioner was seen by a medical assistant who collected blood. Ex. 8 at 76. It is not clear what occurred at this visit from the record, and I find that it does not cast doubt on Petitioner's SIRVA claim.

Petitioner initially sought care for her shoulder pain only four days after vaccination. She was given medication that helped – but once she stopped the medication, her symptoms returned, leading her to consult with an orthopedist. At that visit in early February 2020, she rated her pain as six out of ten. Ex. 10 at 3-5. Three weeks later, her symptoms were bothering her enough that she called her orthopedist and asked to come in sooner than scheduled. However, she then cancelled that appointment.

I find credible Petitioner's explanation that she cancelled her March 17, 2020 appointment due to fears about the COVID-19 virus and her desire to protect her elderly mother. It is noteworthy that Petitioner's scheduled appointment was *less than a week* after the COVID-19 Pandemic was declared, and only *four days* after the start of a nationwide emergency in the United States.[9]

Moreover, this is not a case where a petitioner's symptoms resolved, followed by a lengthy gap and then resumption of care. At the beginning of Petitioner's treatment gap, she was still symptomatic, reporting a not-insignificant pain level of six. When Petitioner resumed treatment in September 2020, she reported that she had done better for a little while after her last visit and her pain had returned – but she did not say that her injury had fully resolved. And there is no evidence that it had. At that appointment and her PT appointment shortly thereafter, she related her pain to her vaccination injury. She tried to obtain care via telehealth to minimize her risk. Her orthopedist declined her request for a virtual appointment, saying that he needed to examine her – so she took precautions and went to his office. But she attended PT through telehealth for five months thereafter.

I also note that I do not make this finding based on testimonial evidence alone. Rather, I find that the medical records, as corroborated by testimonial statements, together establish that, more likely than not, Petitioner's injury continued throughout her treatment gap between February and September 2020 – satisfying the severity requirement.

### F. Other Requirements for Entitlement

The record contains preponderant evidence that other requirements for entitlement are satisfied as well. Petitioner received a covered vaccine in the United States. Ex. 1 at 2. Petitioner states that she has never received an award or settlement, or filed a civil action, for her vaccine-related injuries. Ex. 20.

---

[9] The World Health Organization declared COVID-19 a pandemic on March 11, 2020, and two days later a nationwide emergency was declared in the United States. Centers for Disease Control Museum COVID-19 Timeline, https://www.cdc.gov/museum/timeline/covid19.html (last visited Feb. 19, 2025).

## Conclusion

Based on my review of the record as a whole, I find that it is more likely than not that all SIRVA Table requirements are met. I find that the statutory severity requirement is satisfied by preponderant evidence, as are other requirements for entitlement. Therefore, Petitioner's motion for a ruling on the record that she is entitled to compensation is **GRANTED**.

**IT IS SO ORDERED.**

**s/Brian H. Corcoran**
Brian H. Corcoran
Chief Special Master
